WESTCHESTER COUNTY.—HON. OWEN T. COFFIN, SUR-
ROGATE.—July, 1882.

## THORNE V. UNDERHILL.

*In the matter of the judicial settlement of the account of*
PHILIP R. UNDERHILL, *as executor of the last will*
*of* ELIZABETH R. UNDERHILL, *deceased.*

*It seems,* that Code Civ. Pro., §§ 1832, 1833 and 1834, providing for a re-
buttal of the inventory of a decedent's assets in a "special proceeding,
to which an executor or administrator is a party, wherein the question
*whether he has administered the estate,*" is in issue, apply only to cases
where the executor sets up what is equivalent to the former plea of
*plene administravit,* and not to an accounting; the question in the latter
proceeding being not whether he has administered, but how he has
managed the estate.

As to whether, under Code Civ. Pro., § 2741, permitting the Surrogate, on
a judicial settlement of an executor's account, to allow him "for property
erty of the decedent perished or lost without the fault of the account-
ing party," an executor can be allowed to prove his own title to prop-
erty placed by him on the inventory of, and for years treated by him as
belonging to decedent's estate, *quære.*

Entries in a book, referred to in a will, become, on being identified, incor-
porated into the latter, in order to enable the court to reach testator's
intention.

Testatrix, by her will, after giving one third of the residue to her executors,
in trust to apply the interest and income to the use of her daughter for
life. with remainder over, directed "that this distribution of said resi-
due of said property is subject to this provision—that the third so
directed to be invested for the benefit of my daughter *is to be charged
with the amount which shall be found* on my books charged to her." —

*Held,* that the amount to be deducted from the daughter's third must
include the charges found on the books as of dates subsequent, as well
as prior, to the date of the will.

Lawrence v. Lindsay, 68 *N. Y.*, 108—compared.

THE testatrix was a daughter of Deborah Rhinelander,
and wife of Isaac Underhill. By the will of Deborah
Rhinelander, admitted to probate in 1836, her large estate

was given to the executors in trust for the benefit of Elizabeth R. Underhill, for life, with power given to her to use, occupy, receive income, etc., and also to cause the trustees to sell, rent, lease or convey the real estate, in fee simple absolute, as she should, in writing, require; she was also given power to dispose of, by will, what should remain at her death, as she might see fit. Jacob Rhinelander, an uncle of Mrs. Underhill, by will, admitted to probate in 1837, gave all his estate, real and personal, to her absolutely. The will of Elizabeth R. Underhill, bearing date January 29, 1853, with a codicil dated June 6, 1854, and admitted to probate in March, 1859, among other things, directed all the estate which was of Deborah Rhinelander then remaining unsold, to be sold, and gave and bequeathed the same, subject to some discretionary power vested in the trustees in regard to her husband contained in the will of Deborah Rhinelander, to her son Philip R. Underhill, the executor aforesaid. After making some bequests, to her husband and son, out of the property which she derived from her uncle's estate, she disposed of the rest of the estate so derived as follows: "All the rest, residue and remainder of said property to be divided into three parts. One third part thereof I give to my son Philip R. Underhill; one third part thereof I order my executors, and the survivor of them, to invest on bond and mortgage upon productive real estate, or in stocks of a permanent and productive nature, and to apply the interest or income thereof to the use of my daughter Deborah R. Thorne, wife of John S. Thorne, during her natural life, and upon her decease, to distribute and divide the principal of said one third, and all unappropriated income, unto and among

her lawful issue then living, each then living child of hers taking one equal share thereof, and the issue of any deceased child taking by representation the share which their parent would have taken, if living." The like provision was made of the other one third, for her other daughter Elizabeth M. Guion, for life, with like remainder to her children. Then followed this clause:

" Provided, however, that this distribution of said residue of said property is subject to this provision: That the third so given to my son Philip is to be charged with the amount that shall be found on my books charged to him, and the third so directed to be invested for the benefit of my daughter Deborah, is to be charged with the amount which shall be found on my books charged to her;" and the same provision was made in regard to deductions from Elizabeth's third, the direction being that each third was "to be decreased the amount so found charged against said third part respectively." Her husband and son, and James B. Parsons were appointed executors. By a codicil, however, she revoked the appointment of her husband and Parsons, and appointed her son-in-law, John S. Thorne, and Richard Bowne in their places, both of whom are now dead. Soon after the death of the testatrix, an inventory was taken and filed, by which it appeared that the assets left by her amounted to about $441,000. This was the first proceeding which had ever been had for a settlement of the executor's accounts.

The executor claimed that he had recently discovered that property was placed upon the inventory which should not have been included in it. One item was a bond and mortgage of James Willis, inventoried at $9,303.11, only

one third of which, he alleged belonged to this estate; the obligees and mortgagees being the testatrix, her husband and the executor himself. Another was the bond and mortgage of Edwin C. Litchfield, inventoried at $8,135.34, in which the executor was sole obligee and mortgagee, and he asked to have them deducted from the sum of the inventory.

It appeared that there were no charges found upon the books of the testatrix against the executor, but that there was such a charge against Mrs. Thorne, of $15,000, and against Mrs. Guion, of $42,151.25. The charge against Mrs. Thorne was written by the testatrix with a pencil, and was as follows: " D'r.-Deborah Rhinelander Thorne to estate of E. R. U., 1849, March 20th, to $10,000 stock in Bank America; June 6th, to $5,000 in cash for a lot ground." On the opposite and prior page, in the same handwriting, in ink, were the same items entered thus: "1849, March 20th, paid John Sullivan Thorne ten thousand dollars in stock in the Bank of America, $10,000. 1849, June 6th, five thousand dollars in cash $5,000."

Of the charge of $42,151.25 against Mrs. Guion, $31,-351.25 was entered in various items under dates prior to the date of the codicil to the will; the residue under dates subsequent thereto.

Other facts are sufficiently stated in the opinion, which is given in full so far as relates to the points reported.

L. D. FREDERICKS *and* FRANCIS LARKIN, *for the executor.*

T. H. RODMAN, *for Mrs. Thorne and her daughters.*

RICHARD O'GORMAN. *for Mrs. Murphy, legatee in remainder.*

SMITH & RANDALL, *for B. R. Guion and other legatees in remainder.*

BUTLER, STILLMAN & HUBBARD, *for Elizabeth R. Guion, legatee in remainder*.

THE SURROGATE.—I can but regard this as a most extraordinary case. Here is a very large estate, involving an accounting for about $1,000,000, relating to transactions extending over nearly a quarter of a century, conducted by one person, and he a guileless, simple-hearted man, now of advanced years, largely unfamiliar with affairs, with a confused and defective memory, and the only witness whose evidence can be had as to the history of the somewhat complex transactions involved. Under the circumstances, it may be regarded as marvellous that no great disaster has befallen the estate. While the business has been conducted in a very loose, irregular and confused manner, yet I think, by the aid of counsel on both sides, we shall be able to approximate a result more nearly just than at one period we had dared to hope. In this connection, it may be proper to state that I have been unable to place much reliance upon the testimony of the executor, save where he is corroborated by documentary evidence or circumstances.

Philip R. Underhill was the executor of the wills of Deborah Rhinelander, Jacob Rhinelander, Elizabeth R. Underhill and Isaac Underhill. All of the estates of those testators are more or less involved and interwoven with this accounting. It is not remarkable that the executor, when speaking of funds or securities derived from any of these, whether his individual property or otherwise, should speak of them as belonging to " the estate." It seemed to him to make no difference that he should invest his mother's funds as executor of Jacob Rhinelander, or in his individual name; that he should so con-

tinue to invest them after her death, or to invest the funds of her estate, after her death, in like manner, indifferently. In any event, they all belonged to "the estate."

And here may be properly considered the executor's claim to have the inventory corrected, by deducting therefrom the amounts of the Willis and Litchfield mortgages. It must be remarked that, after the lapse of so many years, after the executor has been paying income to his sisters since the filing of that inventory, on the basis of its correctness, it seems very strange that, at this late day, he should claim they are not properly placed there. He assisted in taking the inventory and himself verified its truthfulness in 1859. Bearing in mind his loose way of transacting business; that many of the mortgages, concerning which he is now accounting unchallenged, stand in his individual name; that his father, who was then living, and who must have been cognizant of the inventory, and is alleged to have been the owner of one third of the Willis mortgage, appears to have made no objection; that he was then more than twenty years younger and with a fresher knowledge of what were then recent transactions; and that his memory is now too confused and treacherous to warrant the placing of any considerable confidence in it, the only safety lies in relying upon the correctness of a transaction of such ancient date, so long undisturbed in its repose, and to feel satisfied that somehow, and under circumstances which the executor's memory fails to recall, that inventory embodied the true statement of assets as they then existed.

The common-law rule was that an inventory was not conclusive for or against an executor (Willoughby v.

McCluer, *2 Wend., 608*). Whether that rule was confined to an action relating to the inventory itself, or extended to other actions in which its correctness was involved, it is, perhaps, immaterial to inquire. In either event, I take it, the effort to *impeach* is, by implication, limited to some person or persons hostile to the party who made the inventory. The executor could, however, be permitted to show that the property was appraised as worth more than it would bring at a fair sale. Counsel have discussed the effect of 2 R. S., 449, §§ 14, 15 and 16, upon this question.

It was provided by that statute that, "in any action against executors or administrators, in which the fact of their having administered the estate of their testator or intestate, or any part thereof" should come in issue, and the inventory of the property of the deceased, made and filed by them should be given in evidence, either party might rebut the same, by proof either that any property was omitted therefrom, or was not returned at its true value; or that any property had perished, or had been lost without the fault of the executor or administrator, or had been fairly sold by him, at private or public sale, at a less price than the value so returned; or that, since the return of the inventory, it had deteriorated or enhanced in value; that the executor or administrator should not be charged with a demand or right of action, included therein, unless it appeared that the same had been collected, or might have been collected with due diligence; that these provisions did not vary any rule of evidence, respecting any proof, which an executor or administrator could then make.

The Code, by §§ 1832, 1833 and 1834, extends these pro-

visions to cases where executors or administrators are parties to special proceedings. I think the fair inference to be drawn from this statute, as thus amended, is that neither party can be allowed to question the correctness of the inventory save in respect to some or all of the grounds so authorized by the statute.

The above sections of the Code do not, however, seem to be applicable to a case of an accounting. The question here being litigated is not whether the executor *has administered* the estate or any part of it, but how he has managed it—what he has on hand, what it amounts to, what he has done—in short he is rendering an account of his proceedings. The statutes would seem to apply only to such cases as those where the executor or administrator sets up what is tantamount to the former plea of *plene administravit*. It would apply to a case where application was made to a Surrogate's court for leave to issue execution, and the executor or administrator should resist it, on the ground that he had no property of the estate, but had fully administered it.

The statute elsewhere provides (Code, § 2741) that, on a judicial settlement, the executor may be allowed for property perished or lost without the fault of the accounting party. So, if he include in the inventory property which belongs to another, and it has been recovered from him by action, or has been surrendered, on proof of the facts, and of the ownership of such other, he will be allowed for it, as for property with which he is charged, which never belonged to the estate.

In order to enable him, in this case, to obtain a credit for these mortgages, on the ground that they did not belong to the estate, we have, on the one hand, the facts

that they were wittingly placed upon the inventory then duly verified by him, and their treatment by him, down to the commencement of this proceeding, as assets of the estate, on which he received and paid interest to the beneficiaries; while, on the other hand, we have the simple bonds and mortgages themselves, with the confused and uncertain testimony of the executor as to the ownership. I do not mean to decide, nor is it necessary here to determine, whether such an alleged mistake, in a proper case, and under clear proof, may or may not be corrected, but simply to hold that under all the circumstances, this claim of the executor must be disallowed, and he remain charged with the amount of these mortgages.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

The next question I propose to consider is as to whether the charges upon the books of the testatrix, against Mrs. Thorne and Mrs. Guion, or any part thereof, may be properly deducted from their respective shares. There is no dispute that the book containing the charges against them was the book of the testatrix. The will provides that the third bequeathed to each shall "be charged with the amount which shall be found on my books charged to her." The book containing these charges was missing at the time of filing the account, and was not found until a late stage of the proceeding. It was proposed to prove then, by the executor, and on his behalf, that the charges therein contained were in the handwriting of the testatrix. This was objected to by the contestants, as incompetent under § 829 of the Code, and was taken subject to the objection. I am inclined to think the evidence was competent. However that may

be, I regard her books as sufficient, whether in her handwriting or that of any other person. The items are found charged on her books, according to the very terms of the will. It did not require that they should be so found in her handwriting. The items of charge against Mrs. Thorne appear upon the book as of dates prior to the date of the will; while, of the $42,155.25 charged against Mrs. Guion, in comparatively small items, very numerous, and running through many years, $31,351.25 were so charged under dates prior to the date of the codicil. Now, were we to halt at this last date, regarding no subsequent charges against the latter to have been made, we should be justified, or even compelled to read the will thus: "I order that the third so directed to be invested for the benefit of my daughter, Deborah, is to be charged with $15,000, and that the third so directed to be invested for my daughter Elizabeth is to be charged with $31,351.25,—each third to be decreased to the extent of those sums respectively." The book, on being identified, became incorporated into the will, and has to be read in connection therewith, in order to enable us to read the intention of the testatrix (Tonnele v. Hall, *4 Comst., 140*). But, as to Mrs. Guion, the charges on the book are continued down to a period shortly anterior to the death of the testatrix, showing advancements made since the date of the codicil, amounting to $10,800. I think the case of Lawrence v. Lindsay (*68 N. Y., 108*) justifies me in holding that this sum, also, must be deducted from the third of which she was to have the use for life. The will in that case provided that "any advancements hereafter made by me . . . . *and* evidenced either by entries in my books of account," etc.;

while here the direction is for the deduction of "the amount which shall be found on my books charged to her." Ch. J. CHURCH was of opinion, in that case, that the entries in the books were, of themselves, sufficient evidence of the advancements, while a majority of the court considered the clause quoted as requiring two things to be proven, namely, that advances were made, *and* that they should be evidenced by entries. The clause in this will requires nothing of the kind, *but* simply that the charges should appear upon the books. She thus, herself, precribed the only evidence requisite to establish the charges, and I think this court would err in attempting to add anything to the will in this respect. This book was evidently in the handwriting of the testatrix, with some trifling and immaterial exceptions; it has all the appearances of genuineness; and no mutilations sufficient to arouse suspicion are discovered. Evidence, however, of these advances, *aliunde* the books, is furnished, consisting of the implied admissions of Mrs. Thorne and Mrs. Guion, in receiving from time to time, from the executor, written statements regarding their interests, which embraced these charges—except that the advance to Mrs. Thorne was therein stated at $10,000 instead of $15,000. Still, I think her share is chargeable with the deduction of the larger sum.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

Of course, the situation of the estate should be fixed as of a certain date, either at the filing of the account, or at the entry of the decree, if the parties so desire. Should any question have been overlooked by me, I will at the settling of the decree, on attention being directed to it,

determine the same. The costs and allowances of all the parties, to be adjusted, will be paid out of the fund.

A decree will be prepared in accordance with the views above expressed.